UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JACOB LINHARES<br><br>Defendant | Criminal No. 21-CR-10212-DPW |

**MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION**

The government submits this memorandum in support of its recommendation for **46 months of incarceration** for the Defendant, followed by three years of supervised release. This recommendation reflects the seriousness of the offense, the need for deterrence and punishment, and is sufficient but no greater than necessary to accomplish the goals of sentencing.

**THE ADVISORY SENTENCING GUIDELINES**

The government agrees with the offense level calculation provided by Probation, which calculated the offense level in the final Presentence Report to be 17 (PSR ¶¶50-60). This same calculation is set forth in the Plea Agreement as the government's position. See ECF #37.

With a criminal history score of 9, the criminal history category is IV (PSR ¶¶72-73), the guideline sentencing range ("GSR") calculated by Probation is 37 to 46 months (PSR ¶130).

The Plea Agreement was submitted pursuant to Fed. R. Crim. P. 11(c)(1)(C), and it calls for a sentencing range of 24 to 48 months. See ECF #37. In the Plea Agreement, the government set forth a calculation consistent with the PSR, and the Defendant reserved the right to contest the application of the 4-point enhancement under USSG § 2K2.1(b)(5). See ECF #37.

As of the date of filing the government's memorandum, the Final PSR has not been circulated by Probation. Consequently, the government cannot make specific reference or

argument to the Defendant's objections as they are not listed, and have not been addressed by Probation in the first instance.

## ARGUMENT

I.  APPLICATION OF THE SENTENCING GUIDELINES

The government bears the burden of proving the facts "supporting an enhancement by a preponderance of the evidence." United States v. Damon, 595 F.3d 395, 399 (1st Cir.2010). In finding the facts supporting an enhancement, "[a] sentencing court is entitled to rely on circumstantial evidence and draw plausible inferences therefrom." United States v. Marceau, 554 F.3d 24, 32 (1st Cir. 2009); United States v. Paneto, 661 F.3d 709, 716 (1st Cir. 2011).

Assuming that the Defendant challenges the application of the 4-point enhancement under USSG § 2K2.1(b)(5), the government would request the Court overrule that objection, and apply the 4-point enhancement. In particular USSG § 2K2.1(b)(5), calls for a 4 point increase to the offense level when "the defendant engaged in the trafficking of firearms." USSG § 2K2.1(b)(5). The applicability of this enhancement, as stated in Note 13, requires further proof that the:

> the defendant—
>
> > (i)  transported, transferred, or otherwise disposed of two or more firearms to another individual, or received two or more firearms with the intent to transport, transfer, or otherwise dispose of firearms to another individual; and
>
> > (ii)  knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual—
> >
> > > (I)  whose possession or receipt of the firearm would be unlawful; or
> > > (II)  who intended to use or dispose of the firearm unlawfully.

USSG § 2K2.1(b)(5), Note 13(A).[1] There is no real question about the transfer of two or more firearms.

---

[1] An "Individual whose possession or receipt of the firearm would be unlawful" is further defined as "an individual who (i) has a prior conviction for a crime of violence, a controlled

Given the facts here, the government asserts that there is sufficient evidence that the Defendant knew the UC "intended to use or dispose of the firearm[s] unlawfully" to substantiate the 4 point trafficking enhancement. USSG § 2K2.1(b)(5), Note 13(A)(ii)(II). "To satisfy the unlawful use or disposition prong, the government does not need to prove that the defendant knew 'of any specific felonious plans on the part' of the recipient of the firearms." United States v. Ilarraza, 963 F.3d 1, 12 (1st Cir. 2020), quoting United States v. Marceau, 554 F.3d 24, 32 (1st Cir. 2009). "Nor must the government prove the defendant's knowledge of the recipient's intent by direct evidence." Ilarraza, 963 F.3d at 12. "Put simply, a sentencing court may rely on circumstantial evidence and the plausible inferences therefrom to find that a defendant knew or had reason to believe that the recipient planned to use or dispose of the firearms in an unlawful manner." Id.; see United States v. Taylor, 845 F.3d 458, 460-61 (1st Cir. 2017); Marceau, 554 F.3d at 32.

In this case, the firearms that the Defendant transacted "were easily concealed handguns, which are tools of the drug trade," Stebbins, 523 F.Appx. at 4. These firearms, of course, were themselves manufactured by the Defendant and untraceable due to the absence of any serial number.

---

substance offense, or a misdemeanor crime of domestic violence; or (ii) at the time of the offense was under a criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." USSG § 2K2.1(b)(5), Note 13(B). Consequently, the Defendant needs to know that the individual to whom the firearms are being provided is prohibited from possessing firearms based upon certain types of qualifying convictions. As such, the government acknowledges that the nature of the information known to the Defendant was not sufficient to support the trafficking enhancement under Note 13(A)(ii)(I). The government notes that given the evolving definition and application of categorical approach, and the specificity required to parse a conviction into these categories, this requirement virtually precludes its application in most circumstances.

Furthermore, "the clandestine nature of the sale[s]" support the unlawful nature of the firearms' use and disposition. See United States v. Tavares, 427 F.3d 122, 125-26 (1st Cir. 2005) (noting the relevance of these considerations in applying trafficking enhancement). These sales took place during covert meetings in vehicles in parking lots,[2] arranged through phone calls and text messages involving coded language, with secrecy and efforts to conceal their activity, and sale prices vastly exceeded the market value for the firearms.[3] During the first meeting, the Defendant hid the bag with the firearm behind a nearby store, and wrapped it in a red handkerchief. See PSR ¶¶16-20. The Defendant also informed the undercover agent ("UC") that he sourced the parts for the firearms from multiple companies to obscure the fact that an entire gun was being manufactured. See PSR ¶26. Additionally, the nature of the firearms themselves supported their ultimate illicit use. These guns were untraceable because they were privately manufactured by the Defendant and specifically did not have any serial numbers.

The number of firearms being transacted over such a short period of time also suggested the illicit nature of the intended use and disposal of the firearms. See Ilarraza, 963 F.3d at 12-13 ("The number and type of firearms that the CWs sought to buy over a short period of time provided further reason for the district court to doubt the appellant's claim that he did not believe that the purchasers intended to use or dispose of the firearms in connection with some nefarious activity."). The UC conducted four separate purchases of untraceable handguns from the Defendant within the span of three weeks, and agreed to buy more from the Defendant as soon as he manufactured them. Furthermore, during the last deal the UC agreed to give the Defendant

---

[2] See United States v. Taylor, 845 F.3d 458, 460 (1st Cir. 2017) ("The October sale took place in a private home, not a gun store.").

[3] See PSR ¶19 ("LINHARES also said he typically made $800 profit when he sells firearms.").

4

$4,500 up-front in order for the Defendant to purchase the parts necessary to manufacture three additional firearms that the UC intended to buy and inferably resell to his customer base.

Beyond this, the UC informed Linhares that he himself was a felon, and therefore needed to source the untraceable firearms he was buying through Linhares who was an illegal source. See PSR ¶26 ("UC also confirmed to LINHARES that he and LINHARES are both felons."). Not only was it illegal for the Defendant and the UC to possess firearms, but the UC informed the Defendant that he intended to resell the firearms, which itself would be illegal. The "UC stated, 'this is my customer base: people with no serial numbers and who don't leave food behind", meaning his buyers do not want firearms with serial numbers[4] and do not want to leave casings behind." PSR ¶25. The business described by the UC was obviously unlawful both in purpose (untraceable, privately made firearms) and nature. The UC himself was purported to be a felon and could neither lawfully possess or sell firearms. The customers to whom the UC was purportedly going to sell the firearms were therefore inferably criminals and those who were going to unlawfully possess and use the firearms.[5]

If there was any lingering doubt, the illegal nature of the UC's business was further proven during the exchange where the UC provided the Defendant with a Taurus firearm that the Defendant wanted. The UC told the Defendant that the "firearm is clean and that there are no

---

[4] See United States v. Ilarraza, 963 F.3d 1, 13 (1st Cir. 2020) ("This reminder provides powerful (albeit circumstantial) evidence that the appellant believed that the CWs had felonious plans for the firearms because the obliteration of a serial number is almost always done in anticipation that the gun will be used in criminal activity.").

[5] See PSR 19 ("UC told LINHARES" "that his 'business', meaning the people he sold the firearms to, were in Massachusetts"), 21 ("UC stated 'they like the 9s' and that his buyers 'want to arm up and protect themselves'"), 23 ("UC indicated his 'guy', meaning buyer, was looking for two or three firearms"), 26 ("UC indicated that one of his buyers is from Boston and indicated that his buyer inquired about obtaining two or three firearms"), 34 ("UC responded that his customers want the 9s anyway.").

5

bodies on it, meaning it had not been used in a violent crime." PSR 31.  All told, there more than sufficient evidence to substantiate that the Defendant knew the UC was an individual "who intended to use or dispose of the firearm[s] unlawfully."  USSG § 2K2.1(b)(5), Note 13(A)(ii)(II).

**II.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)**

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2).  Among those factors are the "nature and circumstances of the offense," promoting respect for the law, and providing just punishment.  See 18 U.S.C. § 3553(a)(2)(A).  The sentence must also afford "adequate deterrence" for both the defendant and others.  See 18 U.S.C. § 3553(a)(2)(B) (the court may impose a sentence "to afford adequate deterrence to criminal conduct").  Lastly, the sentence must protect the public from the further crimes of the Defendant.  See 18 U.S.C. § 3553(a)(2)(C) ("protect the public from further crimes of the defendant").  Consideration of the § 3553(a) factors demonstrates that a sentence of 46 months is sufficient, but not greater than necessary, to meet the goals of sentencing.

**A.    Nature and Circumstances of the Offenses**

There is a process to register privately made firearms and obtain a serial number to be affixed to it.  Due to his extensive criminal history and jail sentenecs, the Defendant could not possess or manufacture such weapons, and certainly could not lawfully register or serialize them.  Consequently, the Defendant is precisely the type of offender who should face significant penalty for violating the firearms laws.  Not only was he prohibited from possessing firearms, but he compounded his crime by manufacturing them, and selling them at a considerable profit.

This Defendant manufactured weapons and sold them on the street.  The weapons that the Defendant made were themselves incredibly useful to criminals because they cannot be traced.

Obliteration of serial numbers warrants a four-point offense level increase. See USSG § 2K2.1(b)(4)(B). Though not specifically subject to an offense level enhancement under the guidelines as of 2021, the creation of firearms without serial numbers should weigh in this Court's consideration of the nature and circumstances of the offense as the Court conciders a proper sentence.

Moreover, the Defendant did not make these firearms and sell them to a purported law-abiding buyer. Rather, the UC in this case all but explained that these guns would find their way into the hands of criminals who intended to use them for criminal purposes. The Defendant knew that the persons who would be using the Defendant's firearms do not want serial numbers and do not want to leave a trail that could be followed by law enforcement. Despite knowing this, the Defendant sought only profit, and indicated that he made at least $800 per weapon. Additionally, the Defendant described firing the weapons to ensure they worked as designed and that these end-users would not be disappointed. See PSR ¶¶14, 20, 32.

To take the Defendant at his word, he had made over fifteen weapons. See PSR ¶19. Unlike in the context of commercially made firearms, the government cannot provide any information to the Court of how many total firearms the Defendant actually manufactured, where they ended up, whether they were used in any crimes, or whether they were recovered. While employing the jigs and machinery to finish the receiver frame and create the firearm, the Defendant just as easily could have marked the firearms with his name or some identifying number. He chose not to do so. As a result, these firearms are untraceable, and that is a feature of their design carried out by their manufacturer, the Defendant.

This Court is left with a Defendant whose crime required sophistication and skill, tools and machinery. It was plainly illegal and known to the Defendant that this was a serious crime.

Moreover, the Defendant knew or could at least surmise that his manufacturing of these firearms would lead to further violence by those who would ultimately be the users of the weapons he was creating. While most crime is circumscribed to the incident or conduct at hand, this Defendant knew that his firearms would cause ripples of violence in the community. Such a crime should be punished by a serious and significant sentence of 46 months.

### B. Criminal History, Specific Deterrence, Punishment

Given the nature of this offense and the circumstances of the Defendant committing these crimes after a lengthy criminal history, the Court must ensure that the Defendant is specifically deterred from committing crimes in the future. The Court must also ensure that the Defendant is appropriately punished as well.

Consideration of the Defendant's criminal history reveals that a sentence of 46 months is proportional to the offense and the offender. The Defendant is an individual who has been committing crimes for essentially his entire life. His numerous prior convictions date back to his teenage years and most of his convictions do not score. The juvenile record consists of malicious destruction of property at age 13 (PSR ¶62); breaking and entering to commit a felony, larceny and open and gross lewdness at age 15 (PSR ¶63); possession of class D at age 15 (PSR ¶64); and assault and battery at age 16 (PSR ¶65).

The Defendant's adult convictions include: violation of an abuse prevention order in 2011 (PSR ¶66); breaking and entering into vehicles, larceny and receiving stolen property in 2012 (PSR ¶67); breaking and entering into a home, and larceny of a firearm in 2012, for which the Defendant served 18 months in the house of correction (PSR ¶¶68, 69); violation of an abuse prevention order in 2017 (PSR ¶70); and violation of an abuse prevention order in 2017 for which the Defendant served 18 months in the house of correction in 2019 (PSR ¶71). This is to say nothing of the eight

other arrests for serious crimes that did not result in convictions. See PSR ¶¶76-84.

Also troubling is the Defendant's history of domestic violence. Five separate abuse prevention orders have been obtained against the Defendant by four different women. These orders date back to 2010, and involve numerous threats to assault, and kill. See PSR ¶¶106-110.

The PSR makes clear that substance abuse, in the form of alcohol and also harder drugs, is a recurrent theme for this Defendant. The Defendant reported starting with marijuana and moving on to cocaine, oxycontin and percocets, and then heroin. See PSR ¶¶117-120. While tragic, there can be no mitigation in this context; it is plain that the Defendant funded his substance abuse through the manufacture and sale of deadly firearms.

In this context, after multiple prior house of correction sentences, the Defendant's persistence in the commission of crimes should be met with a significant multiple year prison sentence. Given the Defendant's technical skills in machining (obvious from the manufacture of the firearms), and his experience as a mason, this Court needs to be mindful of the message of specific deterrence. The Defendant chose crime despite viable and lucrative employment he could have pursued. In particular, the sentence that this Defendant receives must be unequivocal in conveying the message that crime is no longer an option in the future. As a skilled tradesman capable of earning a substantial income (PSR ¶124), this Defendant had many other options besides crime, and certainly will have opportunities after his prison sentence. The government asks that this Court's sentence ensure that the Defendant is specifically deterred in the future.

**C.      General Deterrence, Promotion of Respect for the Law, and Public Protection**

General deterrence and promotion of respect for the law must also be considered, and this Court should be mindful of the message that the sentence will send to firearms manufacturers and traffickers. A sentence of 46 months, the maximum of the guidelines sentence range, does send a

9

message that firearms trafficking is a serious offense that merits a multi-year term of imprisonment. Lastly, this Court must also take the opportunity to protect society from firearms manufacturers and traffickers like this Defendant, whose crimes play out in street violence after the guns are made and sold. In this context, a 46-month sentence is no greater than necessary to serve all these goals.

## CONCLUSION

Based upon the foregoing, the government requests that the Court impose a sentence of 46 months, followed by three years of supervised release.

Respectfully submitted,

RACHAEL S. ROLLINS,
United States Attorney

By:

*/s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston MA 02210
617-748-3674

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney

Date: April 4, 2022